**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LUIS SOUSA,<br><br>            Plaintiff,<br><br>     v.<br><br>SEEKONK SCHOOL COMMITTEE;<br>RICH DROLET, in his personal and official capacities,<br><br>            Defendants. | Civil Action No. 4:22-cv-40120<br><br>**MEMORANDUM IN SUPPORT OF EMERGENCY EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR A PRELIMINARY INJUNCTION** |

**MEMORANDUM OF POINTS AND AUTHORITIES**

**1.0     INTRODUCTION**

Plaintiff Luis Sousa ("Sousa") is a parent who cares deeply for his 5 and 6 year old children and their education.  In retaliation for Sousa's exercise of his First Amendment rights, Defendant Seekonk School Committee ("Committee") and Defendant Rich Drolet, collectively ("Defendants"), issued a Permanent No Trespass Order forbidding Sousa from entering Seekonk Public School grounds and from attending any school related functions or events. The only exceptions are that, upon at least forty-eight hours' written notice, Sousa may attend a parent-teacher conference or a back-to-school night and, at Defendant Drolet's discretion and upon forty-eight hours' written notice, Sousa may request to attend other events.  Drolet has, in his sole discretion, banished Sousa from even seemingly frivolous events like Halloween parties for his children – however, in the context of five and six year old children, this is far from frivolous. Drolet has also banished Sousa from exercising his right to attend school committee meetings.

Defendants' purported justification for unconstitutionally barring Sousa from entering Seekonk public school property and attending Seekonk School Committee meetings is allegedly for "inappropriate and disruptive" behavior. The truth is that Defendants are silencing Sousa because he challenges them and disagrees with them, and they wish to govern without criticism.  M.G.L. c. 266,

§ 120 does not provide Defendants the unconstitutional authority to arbitrarily banish parents from school grounds for expressing their viewpoints and opinions.

## 2.0 FACTUAL BACKGROUND

### 2.1 Seekonk School Committee BEDH Public Participation Policy

Pursuant to BEDH Public Participation Policy, Public Speak is time "at the start and end of each regularly scheduled School committee meeting" where "individuals and/or groups may address the School Committee during public comment periods." (Dkt No. 1-6) Pursuant to Committee custom, each individual is allotted three minutes during Public Speak. (Dkt No. 1 at ¶ 12) However, the Committee does not strictly adhere to the allotted three minutes for all speakers. (*Id.* at ¶ 19) When the Committee likes a speaker's viewpoint, they get more time. When they do not, the limit is strictly enforced.

Under BEDH Public Participation Policy, there are two, unconstitutional (facially and as-applied) rules:

- Rule 2: "All speakers are encouraged to present their remarks in a respectful manner."
- Rule 9: "Disclaimer: Public Speak is not a time for debate or response to comments by the School Committee. Comments made at Public Speak do not reflect the views or the positions of the School Committee. Because of constitutional free speech principles, the School Committee does not have the authority to prevent all speech that may be upsetting and/or offensive at Public Speak." (Dkt No. 1-6)

### 2.2 Defendants' Unconstitutional Conduct

On January 5, 2022, Sousa arrived at a Seekonk School Committee meeting and intended to address the Committee during Public Speak. (*Id.* at ¶ 6) During Public Speak, Sousa intended to address the mask mandate and his children having to wear masks while attending school. COVID-19 restrictions have eased over time, and Sousa wished to be part of the discussion. In fact, one month later, Massachusetts lifted the mask mandate and other school districts had previously voted to lift the

mask mandate.[2]  Sousa arrived a couple of minutes late for the meeting, and the door was locked. (*Id.*) Sousa observed that the Committee was meeting inside the Superintendent's office. (*Id.*). Sousa walked to the window and began recording the meeting while attempting to get their attention. (*Id.*) Sousa wanted to know why the Committee meeting was canceled after two meetings had already been canceled. (*Id.*)

Soon thereafter, police officers arrived on the scene. (*Id.* at ¶¶ 7-9) Seekonk School Committee Member Kimberly Sluter falsely accused Sousa of banging on the windows and yelling. (*Id.* at ¶ 7). According to the police, Sousa's interactions with them were calm and respectful. (*Id.* at ¶ 9)  Sousa explained to the officers that he wanted to address the Committee about the mask mandate, and he showed the officers the video of his interactions with the Committee.  (*Id.*)  According to the police officers, Sousa was loudly speaking through the window at the Committee members, but he was not banging on the windows. (*Id.*)  Sousa's version of the story is backed up by officers observations at the scene and video evidence that the officers viewed at the scene. (*Id.* at ¶¶ 14-17)

Without cause, several days later, on January 10, 2022, Defendant Superintendent Drolet sent a letter to Sousa threatening to issue a **permanent** no trespass order pursuant to M.G.L. c. 266, § 120 for disturbing the Committee during the January 5, 2022 meeting. (*Id.* at ¶¶ 10-11)

On September 26, 2022, during Public Speak towards the end of the meeting, Sousa's wife, Kanessa Lynn, was addressing the Committee regarding the book "Johnny the Walrus" and why Seekonk Public School refused to allow this book in the school library. (*Id.* at ¶ 12)  It is certainly a valid question to address to a school committee, when they engage in book banning.  After three minutes, the Committee deviated from its custom of allowing additional time to speakers they like, and strictly enforced the time limit, because Lynn was challenging the Committee's decision to ban this book.  They informed Lynn that her time was up and to take a seat. (*Id.*)  Lynn briefly continued speaking, and the Committee adjourned the meeting. (*Id.*)

---

[2] *See* https://reportertoday.com/seekonk/seekonk/stories/massachusetts-school-mask-mandate-lifted,38482?

Sousa was waiting in line to address the Committee and was next in line. (*Id.* at ¶ 13) Sousa began speaking but was told that he was not allowed to speak. (*Id.*) Sousa raised his voice in order to be heard. (*Id.*) At this point, Defendant Drolet intervened and asked Sousa to leave the meeting. (*Id.*) Upon being told to leave, Sousa returned to his seat to collect his belongings and leave the premises. (*Id.*) As Sousa was gathering his belongings, a resource officer entered the room and followed Sousa out of the building. (*Id.*) The Committee reconvened and continued the meeting after Sousa left the premises. (*Id.* at ¶ 14)

The next day, on September 27, 2022, Defendant Superintendent Drolet sent a letter to Sousa admonishing him for his "highly inappropriate and disruptive behavior that required the School Committee to temporarily enter into a recess." (Dkt No. 1-4 at 1) The letter threatened to issue a Permanent No Trespass Order against Sousa. The letter also requested a meeting with Sousa before Defendant Drolet made his final decision. This meeting was pretextual. Defendant Drolet's mind was made up before the meeting occurred.

On October 3, 2022, Defendant Drolet met with Sousa, and Sousa recorded the meeting. (Dkt No. 1 at ¶¶ 17-19) Defendant Drolet cited Rule 2, Rule 7, and Rule 9 of the BEDH Public Participation Policy as reasons for issuing a Permanent No Trespass Order against Sousa. (Dkt No. 1-5) Defendant Drolet alleged that Sousa was argumentative during Public Speak but cited no examples. (*Id*.) Drolet also took issue with Sousa's inability to adhere to Rule 2. Rule 2 states that "[a]ll speakers are encouraged to present their remarks in a respectful manner."

At this point, Sousa has been **permanently** banished from public participation unless Drolet himself makes an exception. (Dkt No. 1-7) His children are five and six years old. Sousa can not pick them up at school. Sousa can not attend their school plays or other events. And since the punishment is permanent, it extends from today until his five year old graduates from high school. Should Drolet see fit, under his banishment decree, Sousa will not even be able to attend his children's graduations. All this because Sousa and his wife dared to challenge the School Committee's views on book banning.

### 3.0 LEGAL STANDARDS

Rule 65 of the Federal Rules of Civil Procedure provides for temporary restraining orders and preliminary injunctions in federal courts upon notice to the adverse party. *See* Fed. R. Civ. P. 65(a) and (b). A temporary restraining order or preliminary injunction must (1) state the reasons why it issued; (2) state its specific terms; and (3) describe in reasonable detail the act or acts restrained or required. Fed. R. Civ. P. 65(d). The principal function of a temporary restraining order or preliminary injunction is to maintain the status quo. *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 48 F.3d 618, 620 (1st Cir. 1995).

Injunctive relief should be issued if: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm if the injunction did not issue; (3) the balance of equities tips in plaintiff's favor; and (4) the injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

"In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam). At this stage, the "court need not conclusively determine the merits of the movant's claim; it is enough for the court simply to evaluate the likelihood . . . that the movant ultimately will prevail on the merits." *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020).

### 4.0 LEGAL ARGUMENT

#### 4.1 Plaintiff Has Standing

"To qualify as a party with standing to litigate, a person must show, first and foremost, an invasion of a legally protected interest that is concrete and particularized and actual or imminent." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997). In the First Amendment context, two types of injuries provide standing without the challenger having undergone criminal prosecution. First, when "the plaintiff has alleged an intention to engage in a course of conduct arguably affected

with a constitutional interest, but proscribed by [the] statute, and there exists a credible threat of prosecution." *Mangual v. Rotger-Sabat*, 317 F.3d 45, 56-57 (1st Cir. 2003) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Second, when a plaintiff "is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences. *Id.* at 57 (collecting cases).

The harm is readily apparent. Defendants issued a Permanent No Trespass Order against Sousa that prohibits him from entering Seekonk Public School grounds and entering any school building. (Dkt No. 1-7) Sousa is prohibited from attending school related functions and events, except when granted a pass by Drolet, the decision for which is left to his arbitrary and unfettered discretion. Sousa is prohibited from petitioning his government at Committee meetings, picking up his children from school, and attending school functions with his elementary school-aged children. And as discussed above, this banishment from public life is *forever* or until Drolet uses his nonexistent decree powers to lift it, at his sole discretion – or until this Honorable Court reminds Seekonk that its ability to comport itself in this manner ended in 1789.

### 4.2   Plaintiff is Likely to Prevail on the Merits of His Claims

In seeking a preliminary injunction, the plaintiff has the burden to show the state action infringes on their First Amendment rights, at which point the state must then justify its actions. *Comcast of Maine/New Hampshire, Inc. v. Mills*, 435 F. Supp. 228, 233 (D. Me. 2019) (citing *Reilly v. City of Harrisburg*, 858 F.3d 173, 180 (3d Cir. 2017)).

Plaintiff's constitutional rights were violated by Defendants' actions, specifically issuance of a retaliatory Permanent No Trespass Order and threatening to enforce it against Plaintiff for his conduct protected under the First Amendment of the U.S. Constitution.

#### 4.2.1   Free Speech Claim

Government actions that infringe upon free speech in a public forum are evaluated under strict scrutiny if they are content-based. They are evaluated under an intermediate scrutiny if they are facially neutral time, place and manner restrictions. Content-neutral time, place, and manner

RANDAZZA | LEGAL GROUP

restrictions are subject to intermediate scrutiny, meaning they must be "narrowly tailored to serve and significant government interest, and … leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). A limited public forum exists "where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Hotel Emples & Rest. Emples Union, Local 100 v. City of N.Y. Dep't of Parks and Rec.*, 311 F.3d 534, 545 (2d Cir. 2002) (internal quotation marks and citation omitted). In such public forums, regulation of the designated subject matter of the forum receives strict scrutiny, but regulation of matters outside of that forum's purpose must only be "viewpoint neutral and reasonable." *Id. at 546*. Legislative meetings that permit public comment are typically considered limited public forums. *See, e.g.*, *City of Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 174-76 (1976)).

As a general matter, prohibiting someone from testifying at a public meeting because they have disrupted or otherwise interrupted the meeting is a "[r]easonable time, place and manner restriction[] on speech in limited public fora." *See Devine v. Village of Port Jefferson*, 849 F. Supp. 185, 190 (E.D.N.Y. 1994) (upholding the expulsion of an individual from a particular open public meeting for disruptive behavior that involved shouting, drowning out other members of the community from speaking and interrupting members of the Board as they attempted to proceed with the business at hand). Such exclusions are only constitutional if they are content-neutral, serve a significant government interest, and leave open alternative channels for expression. *Id*. There is no support, however, for permanent banishment.

For time, place, and manner restrictions to be valid they must not delegate overly broad discretion to a government official, must be narrowly tailored to serve a substantial governmental interest, and must leave open ample alternatives for communication. *See Globe Newspaper Co. v. Beacon Hill Architectural*, 100 F.3d 175, 182 (1st Cir. 1996). In order for a time, place, and manner restriction to be narrowly tailored it must further a substantial government interest. *See Gay Students Org. of Univ. of N.H. v. Bonner*, 509 F.2d 652, 660 (1st Cir. 1974).

The BEDH Public Participation Policy delegates overly broad discretion to the Defendants. In the letter dated September 27, 2022, Defendant Drolet putatively admonished Sousa for his "highly inappropriate and disruptive behavior." (Dkt No. 1-4 at 1)  During the meeting between Defendant Drolet and Sousa, on October 3, 2022, Drolet alleged that Sousa violated Rule 2 by yelling on January 5, 2022 after he was locked out of the Committee meeting and for raising his voice on September 26, 2022 after the Committee told him he was not permitted to speak during Public Speak. (Dkt No. 1-5) These justifications were confirmed in Defendant Drolet's letter dated October 4, 2022 that issued the Permanent No Trespass Order against Sousa. (Dkt No. 1-7)

Rule 2 is vague and unconstitutional as-applied to Sousa. First, in neither the January 5, 2022 nor the September 26, 2022 incident was Sousa properly considered a "speaker" presenting during Public Speak because during both incidents the Defendants had denied Sousa an opportunity to speak before the Committee. Second, Rule 2 encourages the public to present remarks in a "respectful manner" – a vague standard that encourages arbitrary and discriminatory enforcement while failing to provide a reasonable opportunity for the public to understand what conduct is prohibited.  Rule 2 "encourages" speakers, which is an acknowledgement that speakers may alter their tenor and tone during Public Speak.  However, Defendants apply Rule 2 as a mandate that any speech that does not comport with their definition of "respectful" will not be tolerated. What do these terms even mean? See *Cohen v. California*, 403 U.S. 15, 25 (1971) ("one man's vulgarity is another's lyric.").

Rule 9 is also unconstitutional as-applied to Sousa.  Rule 9 prohibits "debate or response to comments by the School Committee." (Dkt No. 1-6)  It appears that Defendants have interpreted this to mean that Sousa is not allowed to engage in debate or response to comments made by the Committee.  Rule 9 is an unconstitutional content-based restriction on speech and petition.  Moreover, that Defendant Drolet's issue with Sousa's argumentativeness is an admission that Defendant Drolet disagrees with Sousa's viewpoints and opinions and seeks to silence him.

"Giving offense is a viewpoint."  *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017).  "[D]isfavoring ideas that offend discriminates based on viewpoint, in violation of the First Amendment." *Iancu v.*

*Brunetti*, 139 S. Ct. 2294, 2301 (2019) (internal quotation marks omitted). A viewpoint need not be political; any form of support or opposition to an idea could be considered a viewpoint. *Matal*, 137 S. Ct. 1744 at 1766 (Kennedy, J., concurring in part) ("The First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side. It protects the right to create and present arguments for particular positions in particular ways, as the speaker chooses.").

Meanwhile, the School Committee believes that it can simply shift the goalposts on any subject being out of bounds by merely opining on it. If the School Committee says that the sky is green and the grass is blue, no speaker may challenge that – lest they run afoul of Rule 9. And if the School Committee says it is banning a book, any comment challenging that violates Rule 9. And the punishment is, apparently, banishment from your childrens' lives and public participation. At the heart of the issue is Defendants do not like Sousa, his opinions, or his viewpoints. They do not like him challenging mask mandates or book banning, or shining light into the shadowlands of the educational curriculum of the Seekonk Public School system. Right before the Committee prevented Sousa from speaking on September 26, 2022, his wife was questioning why the Seekonk Public School banned "Johnny the Walrus."[3] Defendants' issuance of a Permanent No Trespass Order against Sousa for purported rule violations is mere pretext to silence his viewpoints and opinions.

### 4.2.2 Rule 2 is Facially Unconstitutional

"[P]ublic bodies may confine their meetings to specified subject matter . . . . " *Madison Joint Sch. Dist. v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 175 n.8 (1976). But the metes and bounds of such confinement must be viewpoint neutral. "[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it

---

[3] Dolet also alleged that Sousa had violated Rule 7, which prohibits speakers from assigning time to another speaker and prohibits extensions of time without permission from the Chair. But, Sousa had not assigned his time and he is entitled to speak on the same issues as his wife or raise a concern as to how the Committee treated her, just as he is entitled to speak on issues raised by or concerning other members of the public. Coverture, treating spouses as one person, was abolished in the mid-nineteenth century. *Smith v. Cole*, 27 LCR 232, 232 (Mass. Land Ct. 2019).

finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972).

Rule 2 states that "[a]ll speakers are encouraged to present their remarks in a respectful manner." A Policy is impermissibly vague if (1) "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Out of concern or arbitrary suppression of free speech, "the Constitution requires a 'greater degree of specificity' in cases involving First Amendment rights." *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 62 (1st Cir. 2011). "The vagueness of such a regulation raises special First Amendment concerns because of the obvious chilling effect on speech." *Reno v. ACLU*, 521 U.S. 844, 872 (1997). This is highlighted when such vague and arbitrary rules are used to punish speakers for expressing viewpoints that the powers-that-be disapprove of.

The term "respectful" is not defined in the policy, but respect is defined in the dictionary as (1) "a feeling of admiring someone or something that is good, valuable, important, etc."; (2) "a feeling or understanding that someone or something is important, serious etc., and should be treated in an appropriate way"; or (3) "a particular way of thinking about or looking at something."[4] Which definition the Defendants apply is unclear. It appears Rule 2 requires certain types of feelings or particular ways of looking at an issue before presenting remarks to the Committee. In other words, Rule 2 expects the public to hold a certain viewpoint during Public Speak and is unconstitutional on its face. *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) ("Giving offense is a viewpoint.") Presumably, this bans sarcasm, it bans even "dirty looks" or rolling ones eyes, or for that matter, anything that the Seekonk School Committee decides is "disrespectful." To the extent that "respectful manner" does not require a certain viewpoint, it fails to provide the public a reasonable opportunity to understand what conduct is prohibited for speakers during Public Speak. The vague wording permits arbitrary and discriminatory enforcement – and that is how it has been applied.

---

[4] https://www.britannica.com/dictionary/respect

### 4.3 Sousa Will Suffer Irreparable Injury Without an Injunction

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). When a plaintiff seeks injunctive relief for "an alleged violation of First Amendment rights, a plaintiff's irreparable harm is inseparably linked to the likelihood of success on the merits of plaintiff's First Amendment claim." *WV Ass'n of Club Owners and Fraternal Srvs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). Thus, if the plaintiff demonstrates a likelihood of success on the merits of its First Amendment claim, they necessarily also establish irreparable harm. *Fortuño, 699 F.3d at 15*.

In this case, Defendants deprived Sousa of his First Amendment rights on several occasions, including January 5, 2022 and September 26, 2022 by not allowing him to address the Committee and petition his government. (Compl. at ¶¶ 7-9 & 22-25) The Permanent No Trespass Order also irreparably harms Sousa's children. Sousa is not permitted to pick his children up from school or attend activities on school grounds with his children. (*Id.* at ¶¶ 34-35) These overtly zealous restrictions are not narrowly tailored or rationally related to any purported government policies. These fascist restrictions placed on Sousa are retributive and punitive harms against a family by Defendants.

Defendants' decision to enforce the Permanent No Trespass Order prohibits Sousa from all Seekonk school grounds is an ongoing deprivation of Sousa's constitutional rights. Sousa respectfully requests that the Court issue injunctive relief to restore the status quo that existed before the issuance of Defendants' school ban against Sousa.

While constitutionally speaking, attending childrens' holiday events at a public school may not seem lofty, they are of great importance to parents and children alike. The trauma of telling a five year old "Daddy can't be here because the government doesn't like his speech" will be palpable.[5] When this punishment is because the government wants to retaliate against a citizen for exercising his First Amendment rights, it is disgraceful. Drolet and the School Committee are effectively holding Sousa's childrens' well-being hostage so that they can teach him "who is the boss." This Honorable

---

[5] The only positive thing that could come from such trauma is perhaps the Seekonk School Committee will create a lasting memory in these small children which will inspire them to recognize what a danger it is to allow such people to be in power and they will vote accordingly.

Court must exercise its power to instruct them that in a free republic, the Constitution is the boss, not the sensibilities of government officials who wish to send a message that they will not be challenged.

RANDAZZA | LEGAL GROUP

### 4.4 The Balance of Equities Tips in Plaintiff's Favor

When a government regulation restricts First Amendment-protected speech, the balance of hardships tends to weigh heavily in a plaintiff's favor. *See Firecross Ministries v. Municipality of Ponce*, 204 F. Supp. 2d 244, 251 (D.P.R. 2002) (holding that "insofar as hardship goes, the balance weighs heavily against Defendants, since they have effectively silenced Plaintiffs' constitutionally protected speech").

The balance of equities tips in Sousa's favor. Failing to grant the requested injunction will continue to deprive Sousa of his constitutional rights pursuant to the First Amendment of the U.S. Constitution. Defendants will suffer no harm if Sousa is granted the requested injunctive relief. Rather, an injunction will merely restore the rights guaranteed by the U.S. Constitution. A temporary restraining order, to be converted into a preliminary injunction, must issue.

### 4.5 Injunctive Relief is in the Public Interest

Finally, injunctive relief is in the public interest. Generally, the public interest "favors protecting First Amendment rights." *Kelly v. City of Parkersburg*, 978 F. Supp. 2d 624, (S.D. W.V. 2013); *see also Carey v. FEC*, 791 F. Supp. 2d 121, 135-36 (D. D.C. 2011); *Mullin v. Sussex Cnty., Del.*, 861 F. Supp. 2d 411, 428 (D. Del. 2012). The public interest is served by issuing an injunction where "failure to issue the injunction would harm the public's interest in protecting First Amendment rights in order to allow the free flow of ideas." *Magriz v. union do Tronquistas de Puerto Rico, Local 901*, 765 F. Supp. 2d 143, 157 (D.P.R. 2011) (citing *United Food & Commer. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 363 (6th Cir. 1998)). Moreover, the unconstitutional regulations being enforced by Defendants in this case have the potential to harm nonparties to the case because it will limit or infringe upon the rights granted to them by the First Amendment of the United States Constitution as well. *See Wolfe Fin. Inc. v. Rodgeres*, 2018 U.S. Dist. LEXIS 64335, at *49 (M.D. N.C. April 17, 2018) (*citing McCarthy v. Fuller*, 810 F.3d 456, 461 (7th Cir. 2015). Others will be afraid to speak lest they be banned as well.

Sousa has shown that his First Amendment rights are being infringed and that public interest favors protecting those rights. Moreover, the public has an interest in a wide array of viewpoints expressed at Committee meetings. The public interest favors the issuance of the injunction.

### 4.6 At Most, a Minimal Bond Should Be Required

Rule 65 of the Federal Rules of Civil Procedure provides that a court cannot enter injunctive relief unless the moving party "gives security in the amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In other words, a bond should only be required if the enjoined party will suffer any harm from the issuance of the injunction. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 285 (4th Cir. 2002).

Defendants will suffer no damages if the Court issues the requested injunction, which will simply allow Sousa to attend Committee meetings, pick his children up from school, and attend school-related activities with his children. All that the injunction will do is repair the *status quo* and allow Sousa to exercise his constitutional rights. For this reason, Sousa requests that the injunction issue with no bond required. If a bond is required, Sousa requests that it be minimal and no more than $100.00.

### 5.0 CONCLUSION

For the foregoing reasons, the Court should enter a temporary restraining order, to be converted into a preliminary injunction, against the Defendants from enforcing a Permanent No Trespass Order against Sousa, permitting him to attend his children's events on October 21, October 23, the next Committee meeting on November 14, 2022, pick his children up from school, and attend other school-related activities.

Dated: October 20, 2022.		Respectfully Submitted,

/s/ Marc J. Randazza
Marc J. Randazza, BBO# 651477
mjr@randazza.com, ecf@randazza.com
Jay M. Wolman, BBO# 666053
jmw@randazza.com
Randazza Legal Group, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (978) 801-1776

*Attorneys for Plaintiff*
*Luis Sousa*